# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

TERRANCE ROLLAND,                    *
                                     *
            Plaintiff,               *
                                     *
                                     *          CV 105-023
      vs.                            *
                                     *
                                     *
TEXTRON, INC.,                       *
a foreign corporation,               *
                                     *
            Defendant.               *

---

# O R D E R

---

Plaintiff Terrance Rolland brought the instant action against his former employer, Textron, Inc., to recover long-term disability ("LTD") benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq*. ("ERISA"). Plaintiff alleges that Textron misrepresented that he was entitled to LTD benefits in breach of its fiduciary duties. Defendant Textron filed a motion for summary judgment, which the Court granted in part and denied in part on August 13, 2007. Summary judgment was granted insofar as Plaintiff's state law claims were preempted by ERISA, and denied as to Plaintiff's ERISA claim. (See Doc. no. 61.)

The Court conducted a bench trial on the remaining claim on February 12, 2008. Prior to trial, joint stipulations of fact were submitted by the parties. (Doc. no. 62, Ex. A; Doc. no. 79.) Many, but not all, salient facts are covered by the parties' stipulations. The Court has adopted said stipulations and, as such, said

stipulations are hereby incorporated into this Order as noted herein.

During argument, Plaintiff's counsel emphasized that this case ultimately comes down to the credibility of the witnesses. (See FTR Recording System at 10:07:46, 10:37:22.)[1] The Court agrees with counsel's emphasis on the importance of credibility assessments in this particular case. As a result, specific credibility findings are documented herein.

Having carefully considered the pre-trial and post-trial briefs, together with the testimony of the witnesses, the documentary evidence admitted at trial, and the parties' stipulations, the Court makes the following findings of fact and conclusions of law. See Fed. R. Civ. P. 52.

## I. **FINDINGS OF FACT**

### A. E-Z-GO and Textron

1. Plaintiff commenced his employment with E-Z-GO as a temporary press operator around October 1987. (Stip. 23.) Plaintiff became a permanent employee of E-Z-GO in early 1988.

2. E-Z-GO is an operating division of Textron, Inc., located in Augusta, Georgia. E-Z-GO primarily manufactures golf carts in the Augusta, Georgia facility. (Stip. 1.)

3. Textron's corporate headquarters are located in Providence, Rhode Island. Textron has an annual revenue of approximately $11 billion.

---

[1] The final oral argument of March 10, 2008, has not been transcribed, but the Court is able to listen to the hearing on an audio recording system called For the Record ("FTR") and indicate the time marker of the exchange.

4. Textron has approximately 40,000 employees, located in approximately 20 countries.

5. In 2004, approximately 1,000 people were employed at E-Z-GO. Of the 1,000 employees, approximately 400 were salaried employees, and the remaining 600 were hourly employees.

6. Throughout his employment with E-Z-GO, Plaintiff worked as an hourly employee in Department 644, a fabrication shop in the production area of E-Z-GO. (Stips. 2, 4.)

7. Plaintiff was never employed as a salaried employee at E-Z-GO. (Stip. 3.)

8. The employee benefit plans at Textron were divided into two groups; a salaried plan and an hourly plan. Hourly employees were eligible to participate in the hourly fringe benefit plan, while salaried exempt and non-exempt employees were eligible to participate in the salaried benefit plan.

9. Short-term disability ("STD") benefits were part of the benefit plan for hourly employees from at least 1989 forward. (Stip. 8.)

10. However, since at least January 2002, salaried employees were eligible for LTD benefits. The LTD benefits are governed by a LTD plan document and summary plan description ("SPD"). (Stip. 24.)

11. The LTD plan is an employer-paid, fully-insured plan. MetLife has been the insurer of the LTD plan since January 1, 2002.

12. Denise Wilson commenced her employment in E-Z-GO's Human Resources ("HR") Department in 1989, and was the HR Manager between 1991 and June 2004. (Stip. 5.)

13. Ms. Wilson's department was responsible for managing health and disability plans for employees. (Stip. 6.)

14. Since at least September 1989, when Ms. Wilson entered the HR Department, Textron has not offered LTD benefits to hourly employees.

15. There is no open enrollment process for disability benefits at Textron. Rather, employees receive the benefit automatically based upon their employment category. That is, hourly employees are automatically enrolled in STD, and salaried employees are automatically enrolled in LTD.

16. Plaintiff received two employee handbooks while employed by Textron. Plaintiff signed acknowledgments accompanying the employee handbooks that provided:

> No oral statements or representations can change the provisions of this Employee Handbook. I also acknowledge that, except for the policy of at-will employment, terms and conditions of employment with the Company may be modified at the sole discretion of the Company with or without cause or notice at any time. No implied contract concerning any employment-related decision, term of employment, or condition of employment can be established by any other statement, conduct, policy or practice. . . . I understand that this agreement supersedes all prior agreements, understandings, and representations concerning my employment with E-Z-GO.

17. Neither employee handbook indicated hourly employees were entitled to LTD insurance. The first employee handbook listed LTD coverage for salaried employees, but did not list LTD or STD for hourly employees. (See Def.'s Ex. 7.) The second employee handbook did not reference LTD or STD, but it indicated that pay, if any, during leave would be determined by a person's employment category. (See Def.'s Ex. 8.)

## B. Plaintiff's History of STD Leave

1. Plaintiff was absent from work as a result of his diabetes,

and applied for and received STD benefits from March 31, 1997 to May 26, 1997 and from May 30, 1997 to June 30, 1997. (Stips. 14, 15.)

2. Plaintiff submitted a letter to Textron dated December 20, 1999 from one of his treating physicians, noting that he was a diabetic patient who was being treated for chronic ulceration of the right foot. (Stip. 32.)

3. Plaintiff applied for and received STD benefits as a result of a diabetic foot ulcer, indicating he was unable to return to work between May 16, 2000 and August 21, 2000. (Stips. 17, 33.)

4. Plaintiff was absent from work, and applied for and received STD benefits as a result of charcot joint and diabetic neuropathy of his right ankle and foot between March 18, 2002 and May 22, 2002, and again from August 2, 2002 to October 1, 2002. (Stips. 17, 18, 34.)

5. In September 2003, Plaintiff received reimbursements from Textron for a brace for his right foot. (Stip. 19.)

6. Throughout 2003, Plaintiff received treatment for his diabetic condition, including his right foot. (Stip. 36.)

7. Therefore, between March 1997 and December 2003, Plaintiff applied for and received STD benefits on multiple occasions as a result of complications from diabetes, including chronic charcot right foot and ankle problems. (Stip. 29.) Each time Plaintiff applied for STD benefits, Textron obliged his request. Plaintiff admits that Textron never denied any of his requested STD leaves.

## C. Evidence of Plaintiff's Benefits Prior to November 2003

1. On or about February 1988, when he became permanently employed at E-Z-GO, Plaintiff signed a form concerning his insurance

coverage. The February 1988 coverage form does not include or mention LTD benefits. (See Def.'s Ex. 6.)

2. Each year during his employment at E-Z-GO, Plaintiff signed up for certain employee benefits during an open enrollment period that occurred between October and November.

3. On December 6, 2001, Plaintiff completed an enrollment form for group insurance for the 2002 benefit year. The December 6, 2001 enrollment form does not indicate LTD coverage. (See Def.'s Ex. 35.)

4. In October 2002, Plaintiff completed a benefit enrollment worksheet for group insurance for the 2003 benefit year. (Stip. 7.) The October 2002 enrollment worksheet does not indicate LTD coverage. (See Def.'s Ex. 78.)

5. In November 2002, Plaintiff received a Confirmation Statement of his benefits for 2003. The November 2002 Confirmation Statement does not indicate LTD coverage for the upcoming 2003 Plan Year.[2] (See Def.'s Ex. 79.)

**D. Outsourcing to Fidelity and Open Enrollment for Plan Year 2004**

**1. Outsourcing to Fidelity**

a. The enrollment process for Plan Year 2004 was different from previous years, as Textron was in the process of centralizing all of its North American benefit and payroll systems using Fidelity as an outside vendor.

b. Part of the centralization of benefit and payroll systems involved converting to online enrollment. In the Fall of 2003, Fidelity began conducting online enrollment for a pilot group of

---

[2] While Defendant wants the Court to ascribe great significance to the fact that LTD was never shown on the prior enrollment or benefit documents, Plaintiff correctly points out that STD also was not shown on the prior documents.

Textron's businesses, including E-Z-GO.

c. Textron's HR Compliance Officer, Doug Stewart, credibly testified at trial. Mr. Stewart commenced his employment at Textron corporate in 2002 and at that time was the Manager of Benefit Programs. Mr. Stewart was the project lead for the out-sourcing of benefits to Fidelity.

d. Mr. Stewart testified about the outsourcing process and the roles of various entities within that process. Fidelity's role in 2003 was to conduct the annual enrollment, and Fidelity would assume the role of record-keeping services on January 1, 2004.

e. As an outside vendor, Fidelity would serve as the directed record-keeper for Textron by providing records, enrollment services, and a customer service call center for employees.

f. To facilitate the centralized benefit structure and online enrollment process, E-Z-GO's electronic and payroll benefit information was sent to the outside vendor, Fidelity.

g. Some of the information sent from Textron to Fidelity included employment data and the rules that related to benefit eligibility requirements, known as "coding rules." This data was then used to send out Personal Fact Sheets ("PFS") and Confirmation Statements to employees reflecting the benefits in which they were enrolled.

h. As part of the conversion process, Textron transmitted approximately 1,850 coding rules related to eligibility requirements alone, to Fidelity.

i. For Plan Year 2004, hourly employees at E-Z-GO made benefit elections during the open enrollment period of November 12-14, 2003, as scheduled.

j. Prior to the November 2003 open enrollment period, Plaintiff received a PFS which delineated his Plan Year 2003 benefit elections and contribution amounts for each plan. (Pl.'s Ex. 1.) The PFS was generated by Fidelity and sent to E-Z-GO employees after receiving the data feed of employee information from Textron, including whether they were salaried or hourly employees. The PFS purportedly showed the benefits employees had prior to the open enrollment process.

k. Plaintiff's PFS erroneously indicated that he was enrolled in employer-paid salary continuation and LTD benefits, but did not indicate he was enrolled in STD. (Id.)

l. The PFS also provided the following language:

> The Information presented in this Personal Fact Sheet is not intended to be construed to create a contract between Textron, Inc. and any one of Textron's employees or former employees. In the event that the content of this Personal Fact Sheet or any oral representations made by any person regarding the plan conflict with or are inconsistent with the provisions of the plan document, the provisions of the plan document are controlling. Textron, Inc. reserves the right to amend, modify, suspend, replace, or terminate any of its plans, policies or programs, in whole or in part, including any level or form of coverage, by appropriate Company action, without your consent or concurrence.

(Id.)

m. During the first morning of open enrollment prior to commencing the employee enrollment process, E-Z-GO's HR representatives identified errors in the system.

n. Specifically, one error identified was that *hourly* employees were incorrectly shown as being covered by the LTD plan.

o. Essentially, salaried benefits were downloaded for all employees instead of splitting them into the two benefit plans for salaried and hourly status.

p. E-Z-GO's hourly employees, like Plaintiff, were not eligible for salary continuation benefits or LTD, because these benefits were part of the salaried benefit plan offered only to salaried employees.

q. Ms. Wilson contacted Fidelity to determine the source of the error but was unable to correct it during open enrollment.

r. Mr. Stewart testified that he was the final Textron person to sign off on the coding rules before they were sent to Fidelity and, to the best of his knowledge, he thought they were accurate. He humbly admitted that, as project lead, he would have been responsible for the LTD error, but that the error was in no way intentional.

s. Mr. Stewart's understanding of the LTD error is that "in the transmission of data to Fidelity, there was an error with regard to the mapping of certain employee type codes which resulted in the Fidelity system essentially . . . reading . . . those codes as if all the employees were eligible for salaried benefits."

t. Mr. Stewart credibly testified that he was not aware of any way the LTD error could have been purposely or intentionally caused by Textron or E-Z-GO.

u. Meghan O'Connell works for Fidelity in the HR Services Division and became involved in Textron's account at Fidelity in 2005. Ms. O'Connell's deposition testimony confirmed Mr. Stewart's explanation of Fidelity's role as record-keeper for Textron, the outsourcing process, and the LTD error.

## 2. Open Enrollment for Plan Year 2004

a. Given the fact that the benefit year was due to start on January 1, 2004 and the large number of employees at E-Z-GO who needed to go through open enrollment, E-Z-GO moved forward with the enrollment process.

b. Ms. Wilson testified that it was important to proceed with the open enrollment process, despite the error, so that the employees could receive their benefit cards by the start of the new benefit year.

c. Plaintiff and his department went through the open enrollment process on November 13, 2003.

d. As part of the open enrollment process, Plaintiff and other employees proceeded to a conference room filled with computers and members of E-Z-GO's HR department. (Stip. 9.)

e. Plaintiff used the computer to enroll in various benefits offered by Textron. He then received a Confirmation Statement listing his elections for Plan Year 2004. (Pl.'s Ex. 2.)

f. The Confirmation Statement provided that Plaintiff received, among other things, employer-paid salary continuation and LTD, but not STD. (Id.) The Confirmation Statement listed October 17, 2003 as Plaintiff's effective date for LTD. (Id.)

g. The Confirmation Statement further provided:

> A summary of the benefits provided under the plan is contained in the Summary Plan Description. Full details are provided in the official plan documents which governs the operation of the plan. In the event that the content of this application or any oral representations made by any person regarding the plan conflict with, or are inconsistent with, the provisions of the plan document, the provisions of the plan document prevail.

> The information presented in this application
> is not intended to create, nor is it to be
> construed to create, a contract between Textron
> and any one of Textron's employees or former
> employees.  Textron reserves the right to
> amend, modify, suspend, replace or terminate
> any of its plans, policies or programs, in
> whole or in part, including any level or form
> of coverage by appropriate company action,
> without your consent or concurrence.

(Id.)

  h. Ms. Wilson testified that she had already notified Fidelity of the error by the time the Confirmation Statement was sent, but Fidelity had not yet been able to correct the error.

  i. Ms. Wilson testified that she orally explained the LTD error to the hourly employees at each open enrollment meeting.  Ms. Wilson admitted that she only made this correction orally and did not do so in writing, although "in hindsight" she admitted that she should have done so in writing.

  j. Conversely, Plaintiff testified that Ms. Wilson did not mention an error at the open enrollment meeting.  Plaintiff testified that no one ever mentioned it "because we already knew we had [LTD]."

  k. Plaintiff presented three former hourly employees of E-Z-GO to support his contention that there was no mention or correction of an LTD error at the meeting.  However, the testimony of these witnesses was markedly inconsistent with each other and with Plaintiff's testimony, and unsupported by the credible evidence at trial.

  l. Plaintiff's witness, Carl Rollins, worked at E-Z-GO as an hourly employee from 1991 to 2004.  Mr. Rollins testified that neither LTD nor any type of mistake was mentioned by Ms. Wilson at the 2003 meeting.  Mr. Rollins further testified that although he

11

did not have any documentation showing he was ever eligible for LTD, he nonetheless did receive something in writing from Textron from 1991 to 2003 informing him that he had LTD coverage. Mr. Rollins specifically testified that in 2002 he received a document in writing stating that he had LTD and STD coverage.

m. The documentary evidence simply does not support Mr. Rollins' testimony. To the contrary, it refutes it. Mr. Rollins' 2002 Enrollment Worksheet does not reference either LTD or STD. (See Def.'s Ex. 89.) [Sentence removed]

n. Plaintiff's witness, Kenneth Thomas, worked at E-Z-GO as an hourly employee from 1980 until September 2004. Mr. Thomas testified he was present at the November 2003 open enrollment meeting and there was no mention of an error regarding LTD. However, Mr. Thomas proceeded to testify that he never received a document indicating that he was entitled to LTD, but that he "may have received" something in the employee handbook indicating he was entitled to LTD.

o. Finally, Plaintiff's witness, Calvin Payne, worked at E-Z-GO as an hourly employee from 1981 until sometime in 2003. Mr. Payne testified that he received a document at the Fall 2002 meeting, rather than 2003, indicating he had LTD benefits. Mr. Payne was confused as to whether or not he was present at the November 2003 open enrollment meeting and thought that the meetings were held at the beginning of each year. Mr. Payne testified that he inquired with E-Z-GO about LTD after having received the 2002 document but "cannot remember" what he was told.

p. The record evidence refutes Mr. Payne's recollection in critical respects. The enrollment worksheet signed by Mr. Payne in 2002 does not reference LTD, although he testified that he was

12

"quite sure" he elected LTD in 2002. (See Def.'s Ex. 87.) Mr. Payne further testified that when his employment ended due to medical problems, he met with Ms. Wilson who helped him apply for Social Security Disability.

q. There is a lack of credible evidence to establish that the LTD error was not mentioned at the November 2003 open enrollment meeting. The testimony from the former E-Z-GO employees on this issue was wholly inconsistent and does not support a finding that Ms. Wilson failed to mention the LTD error at the meeting.

r. Plaintiff's counsel has pointed out that Ms. Wilson's testimony should be viewed skeptically because, although she no longer works at Textron, she still works in the HR field.

s. After listening carefully to each witness, observing each witness's demeanor, and considering each witness's testimony in light of all of the documentary evidence, the Court finds that Ms. Wilson's testimony was most credible.

t. Also, Plaintiff's counsel has repeatedly argued and has attempted to attach significance to the fact that Textron failed to bring any employees to bolster Ms. Wilson's contention that she orally corrected the erroneous PFS. Among the problems with Plaintiff's argument in that regard are the following: (1) Ms. Wilson did testify, and quite credibly, about her oral correction at the meeting; and (2) the three employees Plaintiff brought to counter her testimony did more harm than good to Plaintiff's case, in that their testimony conflicted in significant areas - raising inconsistencies among themselves and with Plaintiff.

u. Mr. Stewart testified that he was involved with the corrective process with Fidelity and the E-Z-GO HR department.

However, he relied on E-Z-GO's HR department to communicate the issues to their employees.

v. Ms. Wilson testified that in her approximately fifteen years in the HR department at E-Z-GO, Plaintiff is the only hourly employee to ever inquire about LTD coverage. No other hourly employees inquired about LTD coverage or LTD claim forms, either before or after the November 2003 open enrollment.

### 3. **Email Correspondence Among Ms. Wilson, Textron, MetLife, and Fidelity Representatives Regarding the LTD Error**

a. On November 12, 2003, Ms. Wilson sent an email to a number of individuals including Doug Stewart at Textron Corporate, MetLife, and Fidelity stating that the correct breakdown of benefits for hourly employees is "STD benefits only . . . Do not qualify for LTD benefits." (Def.'s Ex. 80.)

b. A chain of email correspondence ensued from Ms. Wilson's November 12, 2003 email between, *inter alia*, Ms. Wilson, Doug Stewart of Textron, a MetLife representative, and a Fidelity representative. (See Def.'s Ex. 80.)

c. On November 14, 2003, in response to Ms. Wilson's email, Doug Stewart asked that Fidelity "please provide an impact analysis of making the change. Please also include whether it is feasible to have a correction in place in time to reflect on the confirmation statements." (Id.)

d. On November 19, 2003, the Fidelity representative replied that she had documented the system changes needed to address the issue and planned to have the changes configured for release by December 6, 2003. (Id.)

e. Also on November 19, 2003, Doug Stewart emailed Ms. Wilson that the new confirmation statements "reflecting the accurate

information" would be sent to employees after December 6th and the $20,750 cost of reprogramming the system would be charged to E-Z-GO. (Id.)

f. The Court was left with the distinct impression that no one at Textron, in Augusta or anywhere else, intentionally mislead Plaintiff into thinking that he had LTD benefits when he did not.

**E. The Conclusion of Plaintiff's Employment**

**1. Plaintiff Becomes Permanently Disabled**

a. On or about December 18, 2003, Plaintiff commenced a STD leave of absence and did not work at Textron again after that time. (Stip. 25.)

b. On or about December 19, 2003, Plaintiff submitted a doctor's note excusing him from work to see an orthopedic specialist. (Stip. 20.)

c. Plaintiff applied for and received STD benefits between December 26, 2003 and June 24, 2004. (Stip. 10.)

d. On or about January 15, 2004, as part of Plaintiff's claim for STD benefits, a doctor found that Plaintiff was permanently disabled and would not be able to return to work due to charcot joint in his right foot and ankle. (Stip. 37.)

e. A doctor's note dated January 21, 2004, which Plaintiff submitted to Textron, indicated that due to treatment of his charcot ankle fracture, Plaintiff was unable to work at that time. (Stip. 38.)

f. A later doctor's note dated February 20, 2004, which Plaintiff submitted to Textron, advised that Plaintiff was permanently 100% disabled and employment was a definite risk for complication. (Stip. 39.)

g. The February 20, 2004 doctor visit was further documented in another doctor's note dated June 22, 2004 which Plaintiff submitted to Textron. The June 22, 2004 note stated that Plaintiff had been seen in the doctor's office on February 20, 2004 for his foot and ankle and was unable to return to work permanently. (Stip. 40.)

h. Ms. Wilson credibly testified that she knew Plaintiff well because of the amount of time she spent with him working on his STD issues throughout her employment at E-Z-GO.

## 2. Plaintiff's Interactions with Ms. Wiborg

a. On April 20, 2004, when Ms. Wilson transferred to another department at E-Z-GO, Lisa Wiborg became the HR Manager at E-Z-GO. (Stip. 11.)

b. Plaintiff's STD leave exhausted in June 2004. Around that time Plaintiff began to have some interactions with Ms. Wiborg regarding his vacation pay and coverage. Plaintiff and Ms. Wiborg have vastly different recollections of their 2004 encounters.

c. Ms. Wiborg testified that at the June 2004 meeting, Plaintiff initially asked her for his unused vacation pay. Ms. Wiborg informed Plaintiff that vacation pay could not be given to someone who was actively on a leave of absence. Ms. Wiborg testified that Plaintiff then asked her about his "disability retirement." Ms. Wiborg did not understand what Plaintiff meant and thought that perhaps he meant LTD benefits. She asked Plaintiff if he was referring to LTD insurance benefits and explained that he did not have LTD benefits. Ms. Wiborg testified that Plaintiff replied he knew he did not have LTD benefits, but was asking about his retirement pension instead. Ms. Wiborg was emphatic and most credible in her testimony when she testified that it was she, and

not Plaintiff, who brought up LTD and that when she did, Plaintiff said he knew he did not have LTD.

d. Plaintiff, however, claims that he went to see Ms. Wiborg to "get the forms for [his] LTD." Plaintiff testified that Ms. Wiborg told him she was new and did not know anything about the process, so she would have to ask Ms. Wilson. Further, Plaintiff contends that Ms. Wiborg told him she also did not know anything about his vacation pay.

e. Ms. Wiborg credibly testified that Plaintiff did not ask for an LTD claim form or present the November 2003 PFS or Confirmation Statement to her at the June 2004 meeting. In fact, other than the misinterpretation of Plaintiff's question about his pension, LTD was not mentioned at the meeting.[3] Plaintiff did tell Ms. Wiborg that Neil Doolittle had promised him some type of pension.

f. Mr. Doolittle was the Employee Relations Manager at E-Z-GO until sometime in April 2004. Mr. Doolittle did not testify at trial.

g. Several weeks after the June 2004 meeting, Plaintiff returned to Ms. Wiborg's office to retrieve his employment file. Ms. Wiborg testified that she had made a mistake by not having his file photocopied as she had promised, so she personally photocopied the file while Plaintiff waited in the lobby. Again at this meeting, according to Ms. Wiborg, Plaintiff did not inquire about LTD insurance coverage, ask for an LTD claim form, or present the November 2003 PFS or Confirmation Statement to Ms. Wiborg.

---

[3] Stipulation 12 reads: "Plaintiff met in person with Ms. Wiborg in late June 2004 to discuss LTD insurance." The Court inquired of counsel what was meant by this stipulation in light of the strong testimony from Ms. Wiborg. Defense counsel explained that he meant that LTD was discussed, but not to imply that there was any specific purpose or agenda for the meeting and certainly not that Plaintiff raised the topic of LTD.

h. Plaintiff, however, testified that at that meeting Ms. Wiborg told him that he did not have LTD because he was an hourly employee. Plaintiff claims he told Ms. Wiborg he did have LTD because he remembered signing up for it and he had always had LTD.

i. In July 2004, Plaintiff received a corrected Confirmation Sheet from Fidelity. The Confirmation Sheet showed his 2004 Plan Year benefits which included STD, but not employer-paid salary continuation or LTD. (Pl.'s Ex. 7.)

j. Around July or August 2004, Plaintiff applied for Social Security Disability Benefits, informing the Social Security Administration that he was unable to work due to problems with his right foot and ankle. (Stip. 26.)

k. On September 1, 2004, Plaintiff's doctor sent a note to E-Z-GO indicating Plaintiff was "permanently disabled." (Stip. 27.)

l. On September 4, 2004, during a discussion with Ms. Wiborg, Plaintiffs employment with E-Z-GO concluded as a result of his permanent disability which precluded him from working. (Stip. 28.) Plaintiff inquired about his vacation pay. Again, according to Ms. Wiborg, Plaintiff did not inquire about LTD insurance coverage, ask for an LTD claim form, or present the erroneous November 2003 PFS or Confirmation Statement to Ms. Wiborg.

m. Plaintiff testified that throughout each meeting he questioned Ms. Wiborg about LTD multiple times.

n. At trial, Ms. Wiborg impressed the Court as an honest, forthright, and careful person who gave extremely credible testimony. The Court carefully observed Plaintiff and Ms. Wiborg, and hereby finds that Ms. Wiborg's testimony is the more credible

version of the events that transpired at the meetings between Plaintiff and Ms. Wiborg in 2004.

o. Ms. Wiborg testified that Plaintiff contacted her in November 2004, and for the first time raised the issue of LTD coverage. Ms. Wiborg testified that Plaintiff told her he had a PFS indicating he was eligible for LTD. Ms. Wiborg explained the PFS had been created in error by Fidelity and that Plaintiff was not entitled to LTD.

p. On or about March 7, 2005, the Social Security Administration notified Plaintiff that they determined he was disabled for Social Security purposes. (Stip. 22.)

q. Plaintiff's right foot and ankle problems prevent him from performing every day tasks. (Stip. 21.)

r. Since December 2003, Plaintiff has been disabled and unable to work regardless of whether he was eligible for LTD benefits through Textron. (Stip. 42.)

**F. Plaintiff's Calls to Fidelity**

1. After his employment concluded and after receiving his employment file from Ms. Wiborg, Plaintiff contacted Fidelity and had conversations with Fidelity representatives on October 13, 14, and 18, 2004.

2. Plaintiff's calls to Fidelity were recorded, and the transcripts of those calls were admitted into evidence at trial. (See Def.'s Ex. 76.)

3. In each of these conversations, Plaintiff told the Fidelity representative he had a November 2003 PFS that shows him enrolled in LTD, and asked whether Fidelity can confirm that he had LTD coverage in 2003 and 2004. (See id.)

4. During the October 13, 2004 discussion, the Fidelity representative informed Plaintiff that their records did not indicate that he had LTD, but that he should contact MetLife and gave Plaintiff the telephone number for MetLife. (See id.)

5. During the October 14, 2004 conversation, the Fidelity representative informed Plaintiff that Fidelity was not Textron's record-keeper in 2003, but he was able to pull up the November 2003 document indicating LTD coverage. However, the Fidelity representative then told Plaintiff the records indicated that as of January 1, 2004 Plaintiff was only enrolled in STD. (See id.)

6. During the October 18, 2004 conversation, the Fidelity representative informed Plaintiff that he needed to contact Textron's HR department because Fidelity's records could neither confirm nor deny whether he was enrolled in LTD for 2003. (See id.)

7. A second conversation on October 18, 2004 again confirmed that Plaintiff did not have LTD as of January 1, 2004, but that Plaintiff needed to contact Textron about coverage in 2003. (See id.)

## G. Plaintiff's Contentions

1. Despite the overwhelming evidence to the contrary, Plaintiff testified that he believed he had LTD coverage at E-Z-GO from the inception of his employment.

2. Plaintiff testified that the person who conducted his initial job interview at E-Z-GO told him LTD benefits would be included in his benefit package. Plaintiff contends that he relied on this interview statement in accepting the job at Textron.

3. Prior to Plaintiff being hired by E-Z-GO, he had also done some temporary work at Kendall's Warehouse and had been laid off

from that job.  Plaintiff testified that about two weeks after E-Z-GO hired him, Kendall's offered him a permanent job.  Plaintiff declined the job at Kendall's, but claims that Kendall's benefit package would have included LTD coverage.

4. Plaintiff testified that he would often discuss his STD leave with Mr. Doolittle, rather than Ms. Wilson.  When asked on cross-examination if Mr. Doolittle ever promised him LTD coverage, Plaintiff replied "no, the company did."

5. Plaintiff testified that he thought he had LTD coverage not only because of the alleged interview statement and the November 2003 documents, but that he had also received a confirmation printout in 2002 that indicated LTD coverage.  Plaintiff said that he no longer had the 2002 printout because he had thrown it away.  No such printout was located anywhere.

6. Contrary to Plaintiff's testimony, his Confirmation Statement dated November 2002 lists his benefits that would become effective in January 2003, and does not list LTD coverage.  (See Def.'s Ex. 79.)

7. Plaintiff admitted that, other than the erroneous November 2003 PFS and Confirmation Statement, he does not have anything in writing that would suggest he was eligible for LTD coverage at any time.

8. Plaintiff testified that although he thought he had LTD coverage, he never actually applied for it or filled out an LTD claim form.  In fact, he never contacted MetLife regarding LTD coverage.

9. Prior to June 2005, Plaintiff had never seen Textron's LTD insurance plan document.  (Stip. 13.)

10. To the extent any of these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

## II. <u>CONCLUSIONS OF LAW</u>

Plaintiff contends that Textron breached its fiduciary duty by allegedly misrepresenting, over an extended period of time, that he was covered by the LTD plan. (<u>See</u> Doc. no. 101.) Plaintiff contends that he relied on these representations to his detriment. Specifically, Plaintiff bases his claim on the alleged 1988 interview statement, the erroneous November 2003 PFS and Confirmation Statement, and his telephone conversations with Fidelity in October 2004. Textron admits that the November 2003 documents from Fidelity contained an error indicating that Plaintiff and all hourly employees were eligible for LTD when, in actuality, they were not.

Textron, however, contends that Plaintiff's claim for breach of fiduciary duty fails because: (1) Textron was not acting as a fiduciary with respect to the plan; (2) Textron did not make misrepresentations to intentionally deceive Plaintiff; and (3) Plaintiff did not detrimentally rely upon said misrepresentations. In addition, Textron emphasizes that even assuming the aforementioned elements were met, Plaintiff nonetheless did not meet the criteria for receiving LTD benefits under the plain language of the plan. More precisely, even if the Court found that Plaintiff was somehow covered by the LTD plan, Textron argues that he would not have been eligible to receive LTD benefits due to his pre-existing condition, as defined by the LTD plan itself.

**A. Breach of Fiduciary Duty Claim**

To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an ERISA plan, Plaintiff must show: (1) Defendant was acting in a fiduciary capacity when it made the alleged misrepresentations; (2) Defendant made a material misrepresentation; and (3) Plaintiff relied on that misrepresentation to his detriment. See Varity Corp. v. Howe, 516 U.S. 489, 498, 116 S. Ct. 1065, 1071 (1996); Henkin v. AT&T Corp., 80 F. Supp. 2d 1357, 1362 (N.D. Ga. 1999) (citing Cerasoli v. Xomed, Inc., 47 F. Supp. 2d 401, 405 (W.D.N.Y. 1999)).

**1. Fiduciary with Respect to the Plan**

a. To establish liability for a breach of fiduciary duty under ERISA, Plaintiff must first show that Defendant is in fact a fiduciary with respect to the plan. Cotton v. Massachusetts Mut. Life Ins. Co., 402 F.3d 1267, 1277 (11th Cir. 2005)(citing Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 289 (11th Cir. 1989). ERISA provides that a person is a plan fiduciary to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or "he has any discretionary authority or discretionary responsibility in the administration of such plan." See 29 U.S.C. § 1002(21)(A).

b. An employer is a fiduciary only "to the extent" it performs a fiduciary function related to the plan, and does not act as a fiduciary when performing employer functions. See Varity, 516 U.S. at 498, 116 S. Ct. at 1071; Cotton, 402 F.3d at 1277. Non-discretionary, ministerial acts related to the plan are not

23

fiduciary actions.  See Adams v. Brink's Co., 2008 WL 142771, *6

(4th Cir. 2008)(citation omitted)(finding employer-plan

administrator was a not a fiduciary with respect to the plan because

while it performed administrative duties for the plan, it lacked

discretionary authority to determine eligibility for benefits or

amount of benefits under the plan); Cerasoli, 47 F. Supp. 2d at 407.

c. Plaintiff has presented insufficient evidence to suggest

that Textron was acting as a fiduciary with respect to the LTD plan

when the erroneous November 2003 documents from Fidelity were

distributed to the hourly employees.  The uncontradicted evidence

established that Textron's HR personnel do not perform fiduciary

functions and possess no discretionary authority regarding the LTD

plan.  The SPD provides that MetLife has authority to interpret the

terms and conditions of the plan and is responsible for the claims

administration and determining whether to admit or deny an LTD

claim.  (See Def.'s Ex. 5, Bates Stamp 000003, 000036.)

d. Even if the credible evidence had established that Plaintiff

was told he would have LTD coverage during his 1988 interview, which

the Court finds it does not, the HR interviewer was not a fiduciary

with respect to the LTD plan.  See Cerasoli, 47 F. Supp. 2d at 408-

409 (even if employer had some discretionary authority, he was not

a fiduciary when alleged misrepresentations about coverage were made

in his capacity as employer, to inform plaintiff about matters

relating to his status as a new employee); Holsey v. Unum Life Ins.

Co. of Am., 954 F. Supp. 144, 148 (E.D. Mich. 1997)(employer's

President and Vice President were not acting in fiduciary capacity

when communicating with employee about his fringe benefits; such

communications were merely discussions that occurred in the normal

course of business and were "quintessential 'employer' function[s]").

e. Simply put, Textron's limited role in relation to the LTD plan does not rise to the level of acting in a fiduciary capacity. Thus, Textron was not acting in a fiduciary capacity when the alleged interview statement was made or when the erroneous documents were sent from Fidelity.

## 2. Intentional Material Misrepresentations

a. Assuming *arguendo* that Textron was a fiduciary with respect to the plan, in cases such as this, where the plan document and SPD are unambiguous, oral representations, promises, or informal written communications cannot alter an ERISA plan, absent a showing of intentional fraudulent promises. See Alday v. Container Corp. of Am., 906 F.2d 660, 666 (11th Cir. 1990)(noting that a fiduciary who makes fraudulent promises in informal communications that deceive employees will not be insulated from liability); Clark v. Hartford Life & Acc. Ins. Co., 195 Fed. Appx. 932, *2 (11th Cir. 2006) (quoting Meadows v. Cagle's, Inc., 954 F.2d 686, 691 (11th Cir. 1992)).

b. A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making a decision regarding his benefits. See Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3rd Cir. 2001).

c. The credible evidence does not support a finding that Textron made material misrepresentations or intentionally misrepresented that Plaintiff had LTD coverage. Plaintiff readily admits and the evidence shows he was permanently unable to work beyond December 18, 2003, regardless of whether he was eligible for

LTD. Further, the credible evidence shows that no other hourly employee inquired about or made a claim for LTD benefits, before or after the November 2003 open enrollment.

d. Textron admits that the November 2003 documents from Fidelity contained an inadvertent error showing LTD coverage for hourly employees. Ms. Wilson credibly testified that she verbally acknowledged and attempted to correct the error at the open enrollment meetings. Textron also admits that the error was not formally corrected in writing until Plaintiff received the corrected Confirmation Statement in July 2004. It is surprising that a company of the size and sophistication of Textron would not have taken more proactive measures to quickly follow up the verbal correction in writing. However, while it may have been a poor decision on behalf of Textron to fail to follow the verbal correction with a written one, the credible evidence does not suggest, much less prove, that this was an intentional act to deceive its employees.

e. Ms. Wilson testified that she told all employees who were in attendance at the open enrollment meetings about the LTD error. Plaintiff's counsel correctly pointed out that Ms. Wilson does not have an attendance record from the meeting and does not account for the fact that the employees had the option of enrolling online from any location. That is, E-Z-GO employees did not have to be present at the open enrollment meetings in order to enroll for benefits for the upcoming year, thus some employees may not have heard Ms. Wilson's correction. While the Court recognized and considered this deficiency in Ms. Wilson's chosen method of rectifying the error, the Court does not find the testimony of the hourly employees

convincing or credible and certainly not indicative that Ms. Wilson was lying.

f. Furthermore, even if the Court were to discount Ms. Wilson's testimony and find that she did not verbally correct the error at the meeting, the other credible evidence at trial warrants a conclusion that Textron did not intend to deceive its employees. The credible testimony of Mr. Stewart and Ms. Wilson, along with the chain of emails among Textron, Fidelity, and MetLife representatives, show that the LTD error was discovered, efforts were being made to correct it, and Fidelity communicated to Textron that the error would be corrected. Ms. Wilson and Mr. Stewart credibly testified about the error, the corrective process, and the related cost.

## 3. Reliance

a. Even if the Court were to find that Textron was a fiduciary and that Textron made a material misrepresentation (which findings the Court specifically does not make), Plaintiff's claim would not prevail for a third independent reason: reliance. Plaintiff has not convinced the Court that he reasonably relied on Textron's admitted error or alleged misrepresentations to his detriment. Plaintiff's only evidence of his promise of LTD coverage at his job interview consists of his own testimony. Plaintiff's unsupported testimony is not credible. Nonetheless, even if the Court were to find that testimony credible, several intervening events and documents would make Plaintiff's continued reliance unreasonable.

b. First, Plaintiff received two employee handbooks subsequent to the alleged interview statement. Neither handbook indicated that hourly employees were eligible for LTD coverage. One of the

handbooks did specifically list LTD under the section for salaried employees. Plaintiff also signed a handbook acknowledgment informing him that the handbook would supersede any oral promises.

c. In regard to the erroneous November 2003 PFS and Confirmation Statement, as discussed *supra*, Ms. Wilson credibly testified that she verbally corrected the error at the open enrollment meeting. Any reliance by Plaintiff on these documents after her verbal correction would be unreasonable. Of particular importance, both documents contained disclaimers indicating that the plan documents would control if the plans were inconsistent with the two Fidelity generated documents.

d. In addition, a careful review of Plaintiff's telephone conversations with Fidelity in October 2004 undermines his contention of reliance on anything prior to the erroneous November 2003 documents. The Fidelity representatives were unable to tell Plaintiff whether he had LTD coverage in 2003 because they were not responsible for Textron's record-keeping at that time. One Fidelity representative was able to retrieve the erroneous November 2003 PFS, which showed LTD coverage. Yet, each Fidelity representative told Plaintiff the records showed that he definitely did not have LTD as of January 1, 2004 and that he should contact MetLife and Textron. Plaintiff repeatedly referred to the November 2003 PFS and asked how Fidelity could tell him he did not have LTD when he had a document saying that he did have LTD.

e. Curiously absent from these conversations is any reference by Plaintiff to any other reason why he believed he had LTD coverage. Plaintiff did not reference the alleged interview statement or convey that he believed he had coverage for any reason

28

other than the November 2003 PFS.  This supports a conclusion that Plaintiff did not believe he had LTD coverage prior to receiving the November 2003 documents.  Further, Ms. Wiborg credibly testified that during her multiple interactions with Plaintiff beginning in June 2004, Plaintiff never inquired about LTD coverage or referenced the November 2003 documents.  It was not until November of 2004 - after he received his employment file - that Plaintiff called Ms. Wiborg and inquired about LTD coverage.  If Plaintiff believed that he had LTD coverage from the inception of his employment in 1988 or from his receipt of the November 2003 PFS, Plaintiff would have asked Ms. Wiborg about LTD at some point in time between June 2004 and November 2004.

f. The transcripts of the Fidelity calls and Ms. Wiborg's testimony undermine Plaintiff's credibility.  Therefore, there is sufficient credible evidence from which to conclude that Plaintiff did not reasonably rely to his detriment on the alleged interview statement, the erroneous November 2003 documents, or the telephone conversations with Fidelity.  Simply put, based on the evidence, the strong, almost unavoidable inference the Court is left with is that Plaintiff knew he did not have LTD coverage.

g. The LTD error in November 2003 and Textron's actions thereafter, do not afford Plaintiff a viable cause of action or grounds for relief. In sum, the credible evidence does not establish and Plaintiff has failed to prove a breach of fiduciary duty claim against Textron.

## B. The LTD Plan's Limitation for Pre-Existing Conditions

1. Even if the Court were to find that Plaintiff, due to the erroneous November 2003 documents, was covered by the LTD plan, he

nonetheless would not qualify for benefits because the LTD plan does not provide benefits for Pre-Existing Conditions.

2. Under the terms of the LTD plan and SPD, only salaried employees working at least 32 hours per week are eligible to receive LTD benefits. (Def.'s Ex. 5, Bates Stamp 000013.)

3. In order to be eligible for benefits, a salaried employee must be an Active Employee. An Active Employee does not include an individual who is on a leave of absence due to Disability. (See Def.'s Ex. 5, Bates Stamp 000015).

4. The SPD provides that no benefits are payable under the LTD plan in connection with a Pre-Existing Condition, as follows:

> You may be Disabled due to a Pre-Existing Condition. No benefits are payable under This Plan in connection with that Disability unless your Elimination Period starts after you have been an Active Employee under This Plan for 12 consecutive months.
>
> A Pre-existing Condition is an injury, sickness, or pregnancy for which you in the 6 months before your Effective Date:
> 1. received medical treatment, consultation, care, or services;
> 2. took prescription medications or had medications prescribed; or
> 3. had symptoms or conditions which would cause a reasonably prudent person to seek diagnosis, care, or treatment.

(Def.'s Ex. 5, Bates Stamp 000024.)

5. The Elimination Period is defined as 180 days of Disability. (Def.'s Ex. 5, Bates Stamp 000013.)

6. The SPD defines Effective Date of coverage as the later of either: (1) your Eligibility Date (i.e. "January 1, 2002 or the date you became an Eligible Employee, whichever is later."), or (2) the date you meet the Active Employee requirements. (See Def.'s Ex. 5, Bates Stamp 000013, 000015.)

30

7. The erroneous November 2003 Confirmation Statement lists Plaintiff's Effective Date of coverage as October 17, 2003.

8. Even if Plaintiff was covered by the LTD plan as of October 17, 2003, he still was not qualified for LTD benefits because he became disabled due to a Pre-Existing Condition that existed in the six months prior to the alleged Effective Date of October 17, 2003, and his Elimination Period did not begin after twelve months of employment under the LTD plan.[4]

9. Therefore, Plaintiff would not have been eligible for LTD benefits under the plan regardless of whether Textron breached its fiduciary duty to Plaintiff.

10. To the extent any of these Conclusions of Law constitute Findings of Fact, they are hereby adopted as both.

### III. **CONCLUSION**

Upon the foregoing, the Court finds that Defendant is entitled to judgment in its favor. Accordingly, the Clerk is directed to **ENTER FINAL JUDGMENT** in favor of Defendant and **CLOSE** this case.

**SO ORDERED** at Augusta, Georgia this  31st  day of March, 2008.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE

---

[4] Plaintiff's counsel ostensibly argues that the Pre-Existing Condition limitation does not apply to Plaintiff because he has had LTD from the inception of his employment or at least since January 1, 2002. For the reasons discussed *supra*, the Court does not find this argument credible or convincing.

31